UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

TYWANNA MONTGOMERY,

       Plaintiff,

v.                            Case No.  8:10-cv-429-T-33AEP

ION MEDIA MANAGEMENT COMPANY,

       Defendant.

_____/

**ORDER**

This cause comes before the Court pursuant to Ion Media Management Company's Motion for Summary Judgment (Doc. # 17), which was filed on January 17, 2011.  Tywanna Montgomery filed a Response on February 7, 2011 (Doc. # 21), and Ion filed a Reply (Doc. # 31) on February 25, 2011.  Also before the Court is Montgomery's Notice of Filing Supplemental Authority (Doc. # 32), Ion's Response (Doc. # 33), Montgomery's Motion to Strike Defendant's Response to Plaintiff's Notice of Filing Supplemental Authority (Doc. # 34), which was filed on April 27, 2011, and Ion's Response (Doc. # 36), filed May 6, 2011. For the reasons that follow, the motion for summary judgment is granted and the motion to strike is denied in this Family and Medical Leave Act case.

I.   **Factual Background**

    A.   **Montgomery's History with Ion Media Management**

Ion Media Management is a wholly-owned subsidiary of Ion

Media Networks, a company that owns and operates television stations and a broadcast network. (Kahme Decl. Doc. # 17-2 at ¶ 1).   Beginning in 1999, Montgomery was employed as the Operations Manager of Ion's Engineering Department, and she reported directly to David Glenn. (Montgomery Dep. Doc. # 24-1 at 75).[1]  In that capacity, she performed a variety of duties, including administrative tasks (such as processing equipment purchase orders), human resources duties, and managing and preparing budgets for Ion and tracking variations in the budget.   During her deposition, Montgomery explained:

> I handled managing all of the capital requests for all of the stations, as well as doing forecasting on a quarterly basis . . . . I also managed the budget day-to-day with regards to the requisitions, expenditures, and variations.  So that way, they would know where they stood with each station as far as within their own budget to make sure that we were remaining within budget at all times.

(Montgomery Dep. Doc. # 24-1 at 75-76).

As to her duties and responsibilities as Operations Manager, Montgomery further testified:

> I also managed the accounting, which was managing Leslie Cossairt, as well as the administration part, which was Wakisa Mwaungulu.  They reported directly to me.  I also handled some of the HR aspects with regards to Corporate Engineering, the employees.  When it was time for open enrollment, I

---

[1] Due to its length, Montgomery's deposition was filed in segments ranging from Doc. # 24, to Doc. # 24-3.

> managed that as well.  I also took on the
> additional responsibilities as the Executive
> Secretary . . . when Dave Glenn's assistant left
> . . . . So when that person left, I had to take on
> those additional responsibilities as well.  And I
> also managed all of the regional engineers' and
> Corporate Engineering expenses with regard to their
> budgets and tracking those expenditures to their
> budgets as well.  I also managed the capital budget
> process for all of the stations on a yearly basis
> . . . with regards to doing research, preparing
> budgets, preparing the presentation budgets for
> review by the board of directors or executives down
> in West Palm.

Id. at 76-77.

Montgomery did not undertake strategic analysis of Ion's budget or evaluate Ion's finances using a financial model. During her deposition, Montgomery conceded that she has never used a financial model, and is unfamiliar with and has never calculated a Return on Investments ("ROI"), an Internal Rate of Return ("IRR"), or a Net Present Value ("NPV"). (Montgomery Dep. Doc. # 24-2 at 151-152). Montgomery does not have a college degree and does not know how to perform "advanced statistical analyses." (Montgomery Dep. Doc. # 24-1 at 134; Doc. # 24-2 at 151-152, 164). Montgomery was employed "at will" by Ion. (Kahme Decl. Doc. # 17-2 at ¶ 4).

As Operations Manager of Engineering, she was given excellent reviews.  Montgomery reported directly to David Glenn for ten years. (Glenn Dep. Doc. # 17-6 at 50).  Glenn

3

testified that he was "very happy" with Montgomery's work product. Id. Jeffrey Quinn, the Chief Financial Officer of Ion, stated in his declaration that "Montgomery performed her job well and received good evaluations." (Quinn Decl. Doc. # 17-3 at ¶ 4).

Montgomery gave birth to her daughter on November 12, 2006. (Montgomery Dep. Doc. # 24-3 at 223). She reported back to work on a part time basis three days later. Id. at 224. Montgomery's daughter was diagnosed with Immune Deficiency Syndrome, which means that her immune system does not have the antibodies to keep her from acquiring illnesses. (Montgomery Dep. Doc. # 24 at 22).

**B.   Changes at Ion**

In May 2009, Ion filed for protection under Chapter 11 of the United States Bankruptcy Code. (Santisi Decl. Doc. # 17-4 at ¶ 2). To prepare for the bankruptcy proceedings, Ion retained Terri Santisi, a business management and organization consultant, in April 2008. Id. at ¶ 1. Brandon Burgess, the CEO of Ion, had a clear directive for Santisi as well as Ion's corporate leaders: to strengthen Ion's Finance Department.[2]

---

[2] Santisi explains that Burgess "relies on his management team to execute the strategy he has outlined for the company." (Santisi Decl. Doc. # 17-4 at ¶ 7).

As explained by Jeffrey Quinn: "Burgess instructed me to expand and improve Finance's operations and upgrade the skills of its personnel." (Quinn Decl. Doc. # 17-3 at ¶ 6). Quinn further explained: "The CEO wanted Finance to have better oversight and analysis of Ion's operations, particularly of those departments (such as Engineering) that were major cost centers." Id.

As to the relationship between the Finance Department and the Engineering Department, Santisi observed, "Prior to Fall 2008, there were no Finance personnel located in Ion's Engineering Department in Tampa." (Santisi Decl. Doc. # 17-4 at ¶ 4). Santisi noted that "Although Montgomery and three other Engineering employees had been providing bookkeeping and clerical-type support for Engineering," no one in Engineering "could perform financial modeling or analyses to assess whether projects (or potential projects) were profitable or cost effective or to evaluate them from a strategic perspective." Id.

Santisi proposed a plan for Ion "to restructure and increase the capabilities of its Finance Department." Id. at ¶ 8. Specifically, she proposed that Ion hire a skilled Finance professional and move Montgomery and three other employees from the Engineering Department into the Finance

Department to work under the direction of the skilled Finance professional. Id. at ¶ 8. Montgomery was interested in the skilled Finance professional position. (Montgomery Dep. Doc. # 24-1 at 124). However, Santisi did not believe that Montgomery was qualified for the position. Ion agreed to implement Santisi's plan, and in late 2008, Ion hired Peter Houghton to be "the skilled, experienced finance professional." Id. at ¶ 9. Houghton, a Finance executive with a Bachelors degree in Finance as well as an MBA, was named "Director of Finance." Id. After a tense meeting with Santisi in December of 2008, Montgomery was moved from the Engineering Department into the Finance Department and began working under Houghton. (Montgomery Dep. Doc. # 24-1 at 105, 110).[3]

As previously noted, Montgomery's child has an immune

---

[3] Montgomery tape recorded Santisi's comments at the meeting (Montgomery Dep. Doc. # 24-1 at 102) and felt "disappointment" because a plan was in place to move her from Engineering to Finance. Id. at 109. Montgomery wanted to stay in the Engineering Department for "comfort reasons." Id. at 110. Montgomery expressed her "[f]rustration with [Santisi]" during the meeting in which Santisi reassigned Montgomery to the Finance Department. Id. at 111. Montgomery was "upset," felt "misled," and corrected Santisi on a number of occasions during the meeting. Id. at 112. Santisi indicates that "Montgomery slammed the door when she left the meeting. Her demeanor and comments about the Finance restructuring caused me concern about Montgomery's willingness or ability to support Houghton." (Santisi Decl. Doc. # 17-4 at ¶ 13).

system disorder, and from 2008, to 2009, Montgomery missed a number of days of work to care for her child.  Michelle Kahme, the Senior Director of Human Resources, indicates that Montgomery "was absent for personal reasons (vacation days, sick days, etc.) 27 days in 2008 and 18.5 days in 2009." (Kahme Decl. Doc. # 17-2 at ¶ 1, 23).  Although Ion indicates that Montgomery was absent 45.5 days between 2008 and 2009, the Court has not been provided with information concerning which days were attributable to the illness of Montgomery's child.  However, Montgomery acknowledged in her deposition that she took "extensive time . . . off because of my daughter's illness." (Montgomery Dep. Doc. # 24-3 at 234).[4]

When Montgomery worked in the Engineering Department, she did not receive negative attention due to her absences. However, under Houghton in the Finance Department, Montgomery's absences were a sore subject.  Montgomery was

---

[4] Montgomery testified that in 2008 "my daughter had approximately . . . 11 to 12 appointments with the pediatrician for illnesses.  And I can't recall how many days I took off for those. . . .  I never took a lot of vacation time, because I knew with her illness, that I needed to save as much as possible.  And a lot of times I would often work from home as well, which was approved by Dave Glenn or Jeff Quinn . . . they indicated that it was okay if I worked from home." (Montgomery Dep. Doc. # 24 at 56-57).  She further testified that her daughter was "sick approximately 46 days" in 2009. Id. at 57.

"shocked" when Houghton asked whether her daughter was "sick again?" rather than saying: "Oh, sorry to hear that . . . I hope she feels better." (Montgomery Dep. Doc. # 24 at 52). One time, Houghton asked "what are you feeding that kid?" <u>Id.</u> at 51. Nevertheless, Montgomery indicated in her deposition that her requests for time off were never refused. (Montgomery Dep. Doc. # 24-3 at 223). Even under Houghton, Montgomery was never penalized for taking a lot of time off from work. <u>Id.</u> at 226.

In early October 2009, Houghton resigned from his position. (Santisi Decl. Doc. # 14-4 at ¶ 15). During his deposition, Houghton explained that during his exit interview he commented that Montgomery "for the role that she was doing she's invaluable . . . she was doing a good job." (Houghton Dep. Doc. # 22-1 at 21). After Houghton resigned, Montgomery, again, expressed interest in the Director of Finance position. (Montgomery Dep. Doc. # 24-1 at 123-124). However, Santisi and Ion's executives determined that she was not qualified for the position. (Santisi Decl. Doc. # 17-4 at ¶ 17; Kahme Decl. Doc. # 17-2 at ¶ 13). Eventually, Houghton's position was filled by Matt French. (Kahme Dep. Doc. # 22-3 at 15).

C. <u>**The Decision is Made to Terminate Montgomery**</u>

On October 14, 2009, Michelle Kahme visited the Tampa

office.  On that date, Montgomery expressed to Kahme that her daughter was very ill and stated to Kahme: "I might have to do FMLA." (Montgomery Dep. Doc. 24-2 at 202).  Montgomery was "really upset" and Khame attempted to console her.  Id. at 203.

The next day, on October 15, 2009, Kahme, Santisi, Emma Orozco (the Director of Human Resources), and Burgess met in New York to discuss Ion's medical insurance policies and other matters.  At that meeting, the decision to terminate Montgomery and replace her with "a technically-expert finance professional" was made. (Kahme Decl. Doc. # 17-2 at ¶ 14). Burgess, as well as Santisi and Kahme reached a "consensus" that Montgomery was no longer needed.  As explained by Santisi:

> We had discussed and agreed that Montgomery did not have the necessary qualifications for that Finance team on a go-forward basis, that is, although she had satisfactorily performed her data collection and compilation duties, Finance was more than just collection/compilation but was analyses, modeling, cost/benefit and sophisticated cost containment analyses, etc.  It is my belief that Montgomery's expertise was more clerical and administrative -- filing of tower leases, overseeing the vouchering of accounts payable, preparation of travel forms and general administrative support to Engineering.

(Santisi Decl. Doc. # 17-4 at ¶ 17).  Santisi further noted that "Ion had now consolidated all engineering and technical

9

operations as well as the station group into one business unit and the requirements for a financial executive to support this new group did not match [Montgomery's] skill set." Id.   In addition, Santisi questioned whether Montgomery was willing and able to "support a new financial executive (Houghton's replacement)" when Montgomery wanted the job for herself. Id.

After the October 15, 2009, meeting in New York, Quinn attempted to stall Montgomery's termination.   Quinn thought that Montgomery "made a contribution to the organization [and] did good work." (Quinn Dep. Doc. # 22-4 at 44).   Therefore, he called Burgess directly and asked that Burgess reconsider the decision to terminate Montgomery.   Id. at 43-44.   However, Burgess refused. Id. at 44.   Kahme stated in her declaration, "Quinn and I considered whether Ion should retain Montgomery in an 'Operations Manager'-type position in addition to hiring a financial analyst. . . . However, there were no existing openings for which Montgomery qualified and there was not a business justification for an Operations Manager-type position" particularly since, at that time, "Ion [was] in the middle of bankruptcy proceedings." (Kahme Decl. Doc. # 17-2 at ¶ 17).

On October 19, 2009, Kahme sent Quinn an email indicating that it was time to tell Montgomery's long time boss, David

10

Glenn, of the decision to terminate Montgomery: "spoke w/Terri [Santisi] this morning.  She said we definitely need to get w/ Dave [Glenn] today.  Either you tell him yourself, or with me in the room.  Your call." (Doc. # 17-2 at 6).  Also on October 19, 2009, Orozco sent Kahme an email indicating, "Dave [Glenn] is back in the office, do you want us to tell him about Ty [Montgomery] sometime today." Id.  On November 4, 2009, Kahme emailed Quinn  asking "Ty [Montgomery] - Are we proceeding w/ her termination on Monday 11/9? . . . I need to know ASAP. I'd actually prefer to wait until Tuesday (just so I can get myself together with her paperwork, etc.)." (Doc. # 17-2 at 7).  On November 9, 2009, Kahme sent Quinn an email with the subject line marked "ty" asking "did you speak with brandon [Burgess] about trying to keep her?  I have a call with RBB [Brandon Burgess] today and I am wondering if I should bring it up?" (Doc. # 17-2 at 8).   On November 10, 2009, Kahme notified Quinn in an email, again with the subject line "ty" that Burgess "set a date -11/30 (monday). no negotiations at all.  wants to make sure theres support in place to handle work load when she exits." (Doc. # 17-2 at 9).  On November 16, 2009, Kahme emailed Orozco and Quinn indicating "Jeff Quinn and I will be in Tampa on Monday 11/30 to handle the Ty [Montgomery] situation." (Doc. # 17-2 at 10).   Also on

11

November 16, 2009, Kahme disseminated an email to one of her subordinates in Human Resources in which she indicated: "Ty's last day will be 11/30.  she will get 12 weeks severance. please prepare the paperwork. . . Please keep this quiet until we get closer." (Doc. # 17-2 at 11).

####    D.    **Montgomery's FMLA Request and her Termination**

November 18, 2009, Montgomery communicated with Lynn Seibert, Ion's benefit manager located in North Carolina, that she was formally requesting FMLA to care for her daughter. (Montgomery Dep. Doc. # 24 at 14; Doc. # 17-2 at 14).  On that very same day, Seibert sent Montgomery a written communication containing the FMLA certification form to be completed by a doctor. (Doc. # 17-2 at 13). Montgomery faxed the completed FMLA paperwork to Seibert on November 23, 2009.  (Doc. # 24-4 at 3).  The FMLA request was approved without delay. (Kahme Decl. Doc. # 17-2 at ¶ 21).

As discussed in the email communications above, Kahme and Quinn planned to terminate Montgomery on November 30, 2009. However, on November 30, 2009, Montgomery was absent from work and therefore, she was not terminated on that day. (Orozco Dep. Doc. # 23 at 27).

On December 2, 2009, Orozco traveled to Tampa and terminated Montgomery.  Id.  Montgomery was not replaced and

12

Ion is not looking for a replacement. (Kahme Dep. Doc. # 22-3 at 25).  Montgomery was offered severance pay of $16,000.00 in exchange for a signed severance agreement; however, she did not accept it. (Montgomery Dep. Doc. # 24 at 38; Kahme Decl. Doc. # 17-2 at ¶ 18).   Montgomery thereafter initiated ligation against Ion alleging wrongful termination.

## II.  Procedural History

On January 14, 2010, Montgomery filed her original complaint in State court in which she alleged violation of the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601. (Doc. # 2).  Ion removed the case to this Court because the complaint raises a federal question.  (Doc. # 1).  On March 3, 2010, Montgomery filed her amended complaint, which is the operative complaint.  (Doc. # 6).  Therein, Montgomery asserts a FMLA interference claim and a FMLA retaliation claim.

On March 22, 2010, Ion filed its answer and affirmative defenses. (Doc. # 7).  Among other affirmative defenses, Ion states as its first affirmative defense: "Plaintiff had no greater rights than she would have had if she had not sought FMLA leave and Defendant would have discharged her even if she had not sought leave." (Doc. # 7 at 3).

On January 17, 2011, Ion filed its motion for summary

judgment and supporting materials, including declarations. (Doc. # 17).  Ion essentially contends that it is entitled to summary judgment on Montgomery's interference claim because, when Montgomery formally filed for FMLA leave on November 18, 2009, it was immediately granted.  As to Montgomery's retaliation claim, Ion contends that it is entitled to summary judgment because the decision to dismiss Montgomery was unrelated to Montgomery's FMLA leave.

Montgomery filed a response to the motion for summary judgment on February 10, 2011. (Doc. # 21).  In addition to challenging Ion's substantive arguments, Montgomery also seeks a ruling that Ion's declarations "are inadmissible and cannot be relied upon by this Court." (Doc. # 21 at 1).  Essentially, Montgomery moves to strike the declarations filed by Ion, arguing that they are procedurally defective.  Ion filed a reply memorandum on February 25, 2011. (Doc. # 31).  In addition, Montgomery filed a Notice of Supplemental Authority. (Doc. # 32).  Ion responded to Montgomery's Notice of Supplemental Authority by referencing its own authorities. (Doc. # 33).  On April 27, 2011, Montgomery moved to strike Ion's response to her Notice of Filing Supplemental Authority. (Doc. # 34).  Ion responded on May 5, 2011. (Doc. # 36).

For the reasons that follow, the Court grants the motion

14

for summary judgment and denies the motion to strike Ion's response to Montgomery's Notice of Filing Supplemental Authority.  The Court also declines to strike the declarations that Montgomery challenges.

**III.  Motions to Strike**

Before delving into summary judgment analysis, the Court will address Montgomery's argument that Ion's declarations filed in support of its motion for summary judgment and Ion's response to Montgomery's Notice of Filing Supplemental Authority should be stricken.

**A.  Declarations**

Montgomery argues that the declarations do not meet the requirements of Rule 56(c)(4) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1746.

**1.  Rule 56(c)(4)**

Rule 56(c)(4) provides, "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).[5]

---

[5] Rule 56 was amended in 2010, and the advisory committee's note to Rule 56(c)(4) states, in pertinent part, that "[a] formal affidavit is no longer required.  28 U.S.C. § 1746 allows a written unsworn declaration, certificate,

Montgomery argues that certain paragraphs within Ion's declarations contain hearsay or are statements made without personal knowledge, such that those statements would be not admissible at trial.  This Court has reviewed the declarations and finds that, while such declarations could be construed as containing some hearsay, the declarations are based on personal knowledge and are otherwise sufficient to survive the motion to strike.  This Court is capable of separating the wheat from the chaff and will not credit improper declaration statements.  Thus, the Court denies Montgomery's motion to strike to the extent it is based on the requirements of Rule 56.

## 2.   28 U.S.C. § 1746

Under 28 U.S.C. § 1746, an unsworn declaration is acceptable in place of an affidavit if it is: "in writing of such person which is subscribed by him, as true, under penalty of perjury, and dated, in substantially the following form: . . . 'I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.  Executed on (date). (Signature).'"

———————————————

verification, or statement subscribed in proper form as true under penalty of perjury to substitute for an affidavit." See Fed. R. Civ. P. 56 advisory committee's note.

Ion's declarations are in the form noted above. Montgomery asserts that the declarations should be stricken because they are not handwritten by the individual declarants. The Court gives her argument short shrift.  A similar argument was raised in <u>Sharpe v. Global Sec. Int'l</u>, Case No. 09-821-WS-B, 2011 U.S. Dist. LEXIS 10841 (S.D. Ala. Feb. 2, 2011). There, the court rejected the contention that declarations needed to be penned by the declarant as follows:

> [T]his Court will not adopt [defendant's] unduly strained interpretation of Section 1746.  To endorse defendant's position would be to overturn decades of practice in this District Court. Furthermore, it would read into the statute a requirement that is not there, would insist on a pointless anachronism in an age where the use of computers and word processing software is ubiquitous in the legal practice, would impute to Congress a technophobia that does not appear to exist, and would prove deleterious to judicial and litigant eyesight given the indecipherable nature of many witnesses' handwriting.  This objection is <u>overruled</u>.

<u>Id.</u> at *11 (emphasis in original).

The Court summarily rejects Montgomery's position that the declarations should be stricken because they are not in the declarants' handwriting.  The Court has carefully reviewed the statute and the declarations at issue, and finds that such declarations comply with the requirements of Section 1746.

**B.    <u>Response to Montgomery's Supplemental Authority</u>**

In addition, the Court denies Montgomery's motion to strike Ion's response to her Notice of Filing Supplemental Authority.  After the motion for summary judgment was fully briefed, Montgomery supplied the Court with a Notice of Supplemental Authority.  Thereafter, Ion submitted its own cases on the subject.  The Court has considered the authorities submitted by both parties in reaching its decision and declines to strike Ion's responsive submission.  If, after briefing is closed, the plaintiff may submit an additional case to the Court, defendant should be granted the same opportunity.  To allow otherwise would unfairly allow one-sided presentation of the issues.

Accordingly, the Court declines to strike the declarations that Montgomery has objected to and denies Montgomery's motion to strike Ion's response to her Notice of Supplemental Authority.  This Court will now move forward with its summary judgment analysis.

**IV.  <u>Summary Judgment Standard</u>**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

18

party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  <u>Mize v. Jefferson City Bd. of Educ.</u>, 93 F.3d 739, 742 (11th Cir. 1996) (citing <u>Hairston v. Gainesville Sun Publ'g Co.</u>, 9 F.3d 913, 918 (11th Cir. 1993)).  A fact is material if it may affect the outcome of the suit under the governing law. <u>Allen v. Tyson Foods, Inc.</u>, 121 F.3d 642, 646 (11th Cir. 1997).  The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial.  <u>Hickson Corp. v. N. Crossarm Co.</u>, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)).  "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for

19

trial." <u>Jeffery v. Sarasota White Sox, Inc.</u>, 64 F.3d 590, 593-94 (11th Cir. 1995) (citing <u>Celotex</u>, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. <u>Shotz v. City of Plantation, Fla.</u>, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. <u>Samples ex rel. Samples v. City of Atlanta</u>, 846 F.2d 1328, 1330 (11th Cir. 1988) (citing <u>Augusta Iron & Steel Works, Inc. v. Employers Ins. of Wausau</u>, 835 F.2d 855, 856 (11th Cir. 1988)). However, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. <u>Morris v. Ross</u>, 663 F.2d 1032, 1034 (11th Cir. 1981).

**V. <u>Analysis</u>**

    **A. <u>The Family and Medical Leave Act</u>**

The FMLA provides that "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period for one or more of the following: . . . (C) In

order to care for the . . . daughter . . . of that employee if such . . . daughter . . . has a serious health condition." 29 U.S.C. § 2612(a)(1). It is not disputed that Montgomery was an eligible employee, that her daughter had a serious health condition, and that the requirements of the FMLA bind Ion.

As explained in <u>Strickland v. Water Works & Sewer Bd.</u>, 239 F.3d 1199, 1204 at n.4 (11th Cir. 2001):

> [T]he FMLA creates two types of claims: interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act, <u>see</u> 29 U.S.C. § 2615(a)(1), and retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act, <u>see</u> 29 U.S.C. § 2615(a)(1)&(2); 29 C.F.R. § 825.220(c)("An employer is prohibited from discriminating against employees . . . who have used FMLA leave.").

<u>Id.</u> Montgomery asserts FMLA interference and FMLA retaliation claims.

### 1.   **FMLA Interference**

"To establish a [FMLA] interference claim, an employee need only demonstrate by a preponderance of the evidence that he was entitled to the benefit denied." <u>Hurlbert v. St. Mary's Health Care Sys., Inc.</u>, 439 F.3d 1286, 1293 (11th Cir. 2006)(internal citation omitted).   In the context of an interference claim, "[t]he employee need not allege that his

employer intended to deny the benefit--the employer's motives are irrelevant." Id.

The Eleventh Circuit has further explained: "Our cases make clear that a causal nexus is not an element of an interference claim, but that the employer can raise the lack of causation as an affirmative defense." Spakes v. Broward County Sheriff's Office, 631 F.3d 1307, 1309 (11th Cir. 2011).[6]  Importantly, the Spakes court held: "If an employer demonstrates that it would have discharged an employee 'for a reason wholly unrelated to the FMLA leave, the employer is not liable' under the FMLA." Id. at 1310 (citing Strickland, 239 F.3d at 1208).

Here, Montgomery informally raised a FMLA issue on October 14, 2009, formally requested FMLA leave on November 18, 2009, and was terminated shortly thereafter on December 2, 2009.  It is not disputed that Montgomery was granted the FMLA leave that she requested without any delay or administrative hurdles.  Nevertheless, Montgomery alleges that Ion interfered with her FMLA rights by terminating her before she was able to use her FMLA leave.

---

[6] The Eleventh Circuit clarified that "the casual nexus element is the 'increased burden' that a retaliation plaintiff faces that an interference plaintiff does not." Spakes, 631 F.3d at 1310 (citations omitted).

Ion immediately processed Montgomery's FMLA paperwork and authorized her to take FMLA leave without delay.[7] Nonetheless, for the purpose of conducting a thorough analysis, the Court will proceed under the assumption that Montgomery has asserted a prima facie case. The Court finds that, even if Montgomery met her prima facie burden on her interference claim, Ion would still be entitled to summary judgment because the record shows that Montgomery would have been terminated regardless of her request to take FMLA leave. This finding is bolstered by Montgomery's statement during her deposition that "I believe that regardless of me filing that [FMLA request], I would have been let go do to my absenteeism . . ." (Montgomery Dep. Doc. # 24-3 at 231).

In addition, the Court turns to the recent FMLA case of Krutzig v. Pulte Home Corp., 602 F.3d 1231 (11th Cir. 2010), for guidance. In Krutzig, an employee requested FMLA leave on August 17, 2007, to have foot surgery after an on-the-job injury. Id. at 1233. The next day, after receiving a customer complaint about the employee, the employer decided to

---

[7] In Lowrey v. Strength, 356 F. App'x 332, 334 (11th Cir. 2009), the court indicated, "Interfering with the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but also discouraging an employee from using such leave." (Internal citation omitted).

terminate the employee. _Id._ at 1234.  The termination was carried out on August 20, 2007, before the employee was able to begin her FMLA leave.  _Id._  It was undisputed that the employer did not know about the FMLA request and terminated the employee "based on her failure to address the issues in her performance improvement plan, including the lack of communication with customers and infractions." _Id._

In affirming the court's grant of summary judgment in favor of the employer on the employee's FMLA interference claim, the Eleventh Circuit held, "[T]he right to commence FMLA leave is not absolute, and that an employee can be dismissed, preventing her from exercising her right to commence FMLA leave, without thereby violating the FMLA, if the employee would have been dismissed regardless of any request for FMLA leave." _Id._ at 1236.  The Eleventh Circuit further commented: "the unrebutted evidence that the decision maker was not aware, at the time of the decision to terminate [the employee] of her request to commence FMLA leave establishes as a matter of law that [the employee's] termination was for reasons other than her requested leave." _Id._

_Schaaf v. Smithkline Beecham Corp._, 602 F.3d 1236 (11th Cir. 2010), is also instructive.  In _Schaaf_, an employee was

demoted from a managerial position to a sales position after she returned from maternity leave protected by the FMLA. The Eleventh Circuit found that the employee met her prima facie burden of showing FMLA interference because "she was not reinstated to the same position she held prior to taking her FMLA leave." Id. at 1241. The district court granted summary judgment in favor of the employer and the employee appealed.

In affirming the grant of summary judgment, the Eleventh Circuit noted: "[T]he crux of the issue is whether [the employer] proved to a legal certainty that Schaaf was demoted for reasons unrelated to her FMLA leave, such that she would have been demoted even if she had not taken leave." Id. The court determined that the employer "offered evidence showing that Schaaf was demoted as a result of her ineffective management style, and Schaaf does not offer any evidence to the contrary." Id. Thus, the court affirmed the grant of summary judgment in the employer's favor on the employee's FMLA interference claim after finding that the employee would have been demoted irrespective of her FMLA leave. Id. at 1243.

The evidence in this case establishes that Montgomery was terminated because she did not have the education or the experience necessary to perform successfully for Ion in the Finance Department. Unlike the plaintiffs in the Schaaf and

25

Krutzig cases, Montgomery was not treated adversely by her employer due to poor performance.  To the contrary, the record is replete with references to Montgomery's positive performance reviews.  Nevertheless, the record evidence conclusively establishes that she was terminated on bases wholly unrelated to her FMLA activity.

Montgomery alerted Kahme on October 14, 2009, that she may need to utilize FMLA leave due to the illness of her child, and on November 18, 2009, Montgomery formally requested FMLA leave.  Even though Montgomery's comments on October 14, 2009, do not comply with the technical requirements of 29 C.F.R. § 825.302(c), they are the kind of remarks that would place an individual such as Kahme, the Director of Human Resources for Ion, on notice that the employee might need to take leave.[8]  Montgomery's brief but direct statement to Kahme

---

[8] See 29 C.F.R. § 825.302(c)("Content of Notice.  An employee shall provide at least verbal notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave, and the anticipated timing and duration of the leave").  However, the Regulation also states, "When an employee seeks leave for the first time for a FMLA-qualifying reason, the employee need not expressly assert rights under the FMLA or even mention the FMLA by name." Importantly, the Regulation also places a duty on the employer: "In all cases, the employer should inquire further of the employee if it is necessary to have more information about whether FMLA is being sought by the employee, and obtain the necessary details of the leave to be taken." Id.

was sufficient to place Kahme on notice that Montgomery raised a potential FMLA concern.   This is especially so because Montgomery had openly discussed the illness of her daughter at work in the past to Houghton, Glenn, Quinn and others. See Cruz v. Publix Super Markets, Inc., 428 F.3d 1379, 1384 (11th Cir. 2005)(indicating that notice by an employee of need for FMLA may be established when "the employee adequately conveyed to the employer sufficient information to put the employer on notice, either at the time of the request or before, that his absence was potentially FMLA-qualifying" and "[t]he employer was well apprised of the employee's family member's medical condition and had reason to believe that this condition was the reason for the employee's absence.")

Ion's corporate leaders, including Kahme, reached a consensus to terminate Montgomery on October 15, 2009, one day after Montgomery and Kahme informally discussed the FMLA. However, this does not cast doubt on the Court's determination that Ion's decision to terminate Montgomery was unrelated to her request to take FMLA leave.

As stated in Gamba v. City of Sunrise, 157 F. App'x 112, 113 (11th Cir. 2005), "The FMLA does not insulate an employee who has requested medical leave from being terminated . . . . So long as the employer would have taken the same action it

27

did regardless of the request for leave, there is no statutory violation."

Ion made the decision to terminate Montgomery on October 15, 2009.   Ion was not required to change its course with respect to Montgomery's termination because she sought FMLA leave.   She did not become insulated from termination on October 14, 2009, when she first voiced the possibility of her need for FMLA leave nor did she become insulated from termination on November 18, 2009, when she formally requested such leave.   On December 2, 2009, Ion carried out its plan to dismiss Montgomery.   Ion explained to Montgomery that she was being dismissed because she lacked the experience necessary to fulfil the duties of her employment in the Finance Department. (Montgomery Dep. Doc. #  24 at 29-30).

The Court does "not sit as a super-personnel department that reexamines an entity's business decisions.   No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers . . . . Rather, our inquiry is limited to whether the employer gave an honest explanation of its behavior."   Chapman v. AI Transp., 229 F.3d 1012, 1030 (11th Cir. 2000).   Montgomery does not have a college degree, she performed mostly secretarial and administrative functions, and she could not

perform sophisticated calculations using financial models. (Montgomery Dep. Doc. # 24-1 at 134; Doc. # 24-2 at 151-152, 164). Ion's executives feared that Montgomery was tethered to the Engineering Department (a major cost center for Ion) and could not think and act independently from the Engineering Department at a time when such independence was required after emerging from bankruptcy.

Assuming that Montgomery met her prima facie burden with respect to her interference claim, Ion is nevertheless entitled to summary judgment because it demonstrated that it "would have taken the same action it did regardless of the request for [FMLA] leave." <u>Gamba</u>, 157 F. App'x at 113.

### 2.   **FMLA Retaliation**

FMLA retaliation claims are analyzed under the burden-shifting framework established in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). <u>Strickland</u>, 239 F.3d at 1208. If a FMLA retaliation plaintiff has established a prima facie case, the defendant must articulate a legitimate and non-discriminatory reason for its action. <u>See</u>, <u>e.g.</u>, <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502 (1993). If the defendant satisfies its burden of production, a retaliation plaintiff must then prove pretext.

A prima facie case of retaliation under the FMLA requires a showing that (1) the employee engaged in statutorily protected conduct, (2) the employee suffered an adverse employment action, and (3) there is a causal connection between the two. <u>Krutziq</u>, 602 F.3d at 1234.

In this case, it cannot be disputed that Montgomery engaged in statutorily protected activity, in addition to her discussion with Kahme on October 14, 2009, she formally requested FMLA leave on November 18, 2009.  Nor can it be disputed that she suffered an adverse employment action--she was terminated.  The only inquiry here is whether a causal connection links these events.  For the purposes of this Order, the Court will assume that Montgomery established her prima facie case.  Even so, Ion is entitled to summary judgment because it has come forward with a legitimate and non-retaliatory reason for dismissing Montgomery, and Montgomery cannot establish pretext.

3.    <u>Ion's Legitimate and Non-Retaliatory Reason
     for Terminating Montgomery</u>

Assuming that Montgomery has set forth a prima facie case of retaliation, Ion must proffer a legitimate, non-retaliatory reason for the adverse employment action it took.  <u>Olmsted v. Taco Bell Corp.</u>, 141 F.3d 1457, 1460 (11th Cir. 1998).

30

Montgomery bears the ultimate burden of proving by a preponderance of the evidence that the reason Ion provides is a mere pretext for prohibited, retaliatory conduct. Id.  To show that the employer's reasons were pretextual, the plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997).

Even if Montgomery has established a prima facie case of retaliation under the FMLA, Ion still prevails in this case because it has provided a legitimate, non-retaliatory reason for Montgomery's termination, and Montgomery has not shown that the reason is pretextual.  In her response to the motion for summary judgment Montgomery indicates that she "can show pretext based upon the inconsistencies in Ion's testimony regarding" whether she had an inadequate skill set, who made the decision to terminate her, and when that decision was made. (Doc. # 21 at 18).

### a.   Montgomery's Skill Set

As outlined in detail above, Ion terminated Montgomery because it wanted an educated and experienced Finance

professional that was capable of performing sophisticated calculations and also wanted a person who could think and act independently from the Engineering Department. As stated by Santisi, Ion wanted to "increase the capabilities of its Finance Department" by "upgrading the skills of its personnel." (Santisi Decl. Doc. # 17-4 at ¶ 7-8).

Montgomery testified that she did not have a college education and testified that she was unfamiliar with "ROI" "IRR" and "NPV" and that she did not know how to perform "advanced statistical analyses." (Montgomery Dep. Doc. # 24-2 at 151-152, 164). Quinn indicated in his declaration that Montgomery's "lack of education and experience in finance matters made it impossible for her to interpret or apply or make recommendations about the results of [financial] computations--tasks that finance professionals are trained to do." (Doc. # 17-5 at ¶ 17). Quinn also feared that Montgomery could not "think and act independently from the Engineering Department that was the subject of scrutiny by the Finance team in Tampa." Id. In addition, Santisi, Ion's bankruptcy reorganization consultant, communicated that Montgomery's skill set did not match the demands of the Finance Department. (Santisi Decl. Doc. # 17-4 at ¶ 17). These statements are consistent with the reason Ion vocalized to Montgomery on the

32

day of her discharge: that Montgomery lacked the experience to work in the Finance Department.

Montgomery testified that she does not know when the decision to terminate her was made or what process was used to reach the decision. (Montgomery Dep. Doc. # 24 at 47-50). Furthermore, nobody at Ion ever indicated to Montgomery that her dismissal was based in any way on her request for FMLA leave or her possible need for FMLA leave. (Montgomery Dep. Doc. # 24-3 at 235). Thus, Montgomery cannot contradict the testimony of Quinn, Santisi, and Kahme that the discharge decision was made in an effort to upgrade the Finance Department and was wholly unrelated to Montgomery's protected FMLA activity.

Montgomery also attempts to prove pretext by arguing that she was a valuable employee who received good evaluations from individuals such as Houghton and Glenn. Montgomery's self assessment as a good employee and the similar references (by Houghton and Glenn) that Montgomery was an employee worth keeping do not establish pretext. See Webb v. R & B Holding Co., Inc., 992 F. Supp. 1382, 1387 (S.D. Fla. 1998)("The employee's perception of himself is not relevant. It is the perception of the decision maker which is relevant. . . . The fact that an employee disagrees with an employer's evaluation

33

of him does not prove pretext."). Furthermore, Houghton was not a decision maker and his generally positive reviews for Montgomery do not change the fact that Montgomery does not possess a college degree and is unable to perform sophisticated financial calculations.[9]

Montgomery also argues that Ion's reasons for terminating her are a pretext for retaliation because she was listed as the "Director" of Finance and Administration on a sealed powerpoint document dated October 1-2, 2009. The Court summarily rejects Montgomery's reference to the powerpoint presentation that is under seal. Without commenting at length on this proprietary document, the Court observes that the document appears to sketch Ion's organizational makeup. The document does refer to Montgomery as the "Director" of Administration and Finance. However, there is no reason to believe that this presentation is probative. There is no indication that this powerpoint was a finished product that was ever presented or relied upon by anyone at Ion. Further, it appears that Montgomery created her own job description on the chart. (Montgomery Dep. Doc. # 24-1 at 120-121). This

---

[9] In addition, Glenn's positive remarks about Montgomery are not probative. He was not a decision maker with respect to Montgomery's termination.

document does not show by a preponderance of the evidence that Ion's business reason for terminating Montgomery was a pretext for retaliation. This is especially so due to the uncompromised evidence on file showing that Montgomery was not qualified for the Director of Finance position.

Montgomery cannot show pretext merely by questioning or quarreling with Ion's decision to release her. Montgomery appears to argue that, although she did not have a college education and could not perform sophisticated calculations, that she could be trained to do certain calculations. However, the Court need not consider this argument. As stated by the court in Chapman, "A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it." 229 F.3d at 1030. Further, "the employee cannot succeed by simply quarreling with the wisdom of that reason." Id.; see also Alexander v. Fulton Cty., Ga., 207 F.3d 1303, 1341 (11th Cir. 2000)("it is not the court's role to second-guess the wisdom of an employer's decision.")

### b.   Who Made the Decision and When?

Montgomery also contends that there are genuine issues of material fact concerning who made the decision to terminate her and the timing of her termination.  Montgomery's argument that it is unclear who made the decision to terminate her is unavailing because, there is no evidence on file to contradict Ion's evidence showing that on October 15, 2009, Burgess, Kahme, and Santisi met in New York and the decision to terminate Montgomery was reached.[10]  Montgomery focuses on Burgess's testimony that he did not make the decision to terminate her and that he cannot identify an individual at Ion that decided to terminate Montgomery. (Burgess Dep. Doc. # 22-5 at 6-7).  This testimony does not create a jury issue. Burgess also testified:

> I obviously run the company, so I -- there is a certain number of things that I can deal with personally, and a certain number of things that I cannot deal with personally.  I would say that my perception is that Ty Montgomery is situated at a place in the organization--or was situated in a place in the organization that was probably slightly further down in the structure that I'm not sure day-to-day involvement from my perspective was warranted.

Id. at 8-9.  Further, Burgess testified that Kahme and others "handle a lot of the day-to-day personnel issues on a

---

[10] Orozco also attended a part of the meeting, but it does not appear that she was involved in the decision to terminate Montgomery.

36

functional basis; and Jeff Quinn, on a financial organizational basis. So somewhere in there, I think, was the thought process that led to the outcome." <u>Id.</u> at 6-7.

Burgess's testimony is somewhat murky; however, its nebulous nature does not tip the scales in favor of finding pretext. No reasonable jury would find that Ion's reasons for terminating Montgomery were a pretext for retaliation based on Burgess's testimony. His testimony is consistent with Kahme's declaration statement that "The decision to discharge Montgomery was a consensus: CEO Burgess mandated the improvement of the Finance Department and Santisi, Quinn and I concluded that, to achieve that goal, Montgomery should be released." (Kahme Decl. Doc. # 17-2 at ¶ 16). This is also consistent with the evidence that Burgess delegated to his management team the duties of effectuating his business plan. (Santisi Decl. Doc. # 17-4 at ¶ 7).

In addition, a series of emails between Kahme, Quinn and others confirms the timing of the decision to terminate Montgomery and the events leading to her dismissal. On October 19, 2009, after the October 15, 2009, meeting in New York, Kahme, Quinn, and Orozco discussed how to inform Glenn of Montgomery's termination. (Doc. # 17-2 at 6). On November 10, 2009, Kahme notified Quinn in an email that Burgess

mandated that Montgomery be terminated by November 30, 2009. (Doc. # 17-2 at 9).   On November 16, 2009, Kahme emailed Orozco and Quinn indicating "Jeff Quinn and I will be in Tampa on Monday 11/30 to handle the Ty situation." (Doc. # 17-2 at 10).   On November 16, 2009, Kahme disseminated an email indicating: "Ty's last day will be 11/30.  she will get 12 weeks severance." (Doc. # 17-2 at 11).  As noted previously, Montgomery was not terminated until December 2, 2009, because she was absent on November 30, 2009. (Orozco Dep. Doc. # 23 at 27).

The email communications as well as other evidence noted above rebut Montgomery's contention that there is a material issue of fact as to when the decision to terminate her was made.  The record shows that the decision to terminate her was made on October 15, 2009, and was carried out on December 2, 2009.

Montgomery also asserts the related argument that there is a genuine issue of material fact for jury consideration because, although Ion planned to replace her with a skilled Finance executive after her termination, it never did and Ion is not looking for a replacement.  The record shows that, after Montgomery was terminated, Ion hired French to replace Houghton.  As explained by Santisi, French is more capable

38

than Houghton, and French determined that it was unnecessary to hire another executive: "Montgomery ha[s] not been replaced . . . . [T]he Finance Department distributed Montgomery's administrative and data collection/compilation work among the remaining Finance personnel and Houghton's replacement elected not to hire an additional person.  It appeared to me that Houghton's replacement was more technically proficient and effective than Houghton had been." (Doc. # 17-4 at ¶ 21). Ion's ultimate decision not to replace Montgomery does not establish pretext.  Considering this evidence in the light most favorable to Montgomery, Ion's business decision not to fill her position does not create a factual dispute for resolution by a jury.

Ion's proffered reasons for terminating Montgomery are non-discriminatory, are reasonable, and are not rebutted by Montgomery.  With respect to an "at will" employee like Montgomery, "An employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory [or retaliatory] reason." Chapman, 229 F.3d at 1030 (citing Nix v. WLCY Radio, 738 F.2d 1181, 1187 (11th Cir. 1984)).

This Court has considered all of the evidence in the light most favorable to Montgomery as the non-movant. Nevertheless, the Court grants summary judgment in favor of Ion because Ion has come forward with a proffered legitimate and non-retaliatory reason for terminating Montgomery (supported by copious unrefuted items of evidence), and Montgomery has failed to come forward with evidence to demonstrate that Ion's proffered legitimate and non-retaliatory business decision to terminate Montgomery was a pretext for retaliation.

Accordingly, it is hereby

**ORDERED, ADJUDGED,** and **DECREED:**

(1) Defendant's Motion for Summary Judgment (Doc. # 28) is **GRANTED**.

(2) Montgomery's Motion to Strike Defendant's Response to Plaintiff's Supplemental Authority (Doc. # 34) is **DENIED**.

(3) The Clerk is directed to enter Judgment in Ion's favor and, thereafter, to close this case.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this <u>10th</u> day of May 2011.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

Copies: All Counsel of Record